IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| BIG DRIVE CATTLE, L.L.C., | ) | |
| | ) | CASE NO. BK11-42415 |
| Debtor(s). | ) | A13-4040 |
| JAMES A. OVERCASH, Chapter 11 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | CHAPTER 11 |
| | ) | |
| vs. | ) | |
| | ) | |
| CAROL KNISLEY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER</u>

Trial was held in this matter on February 10, 2015. Bruce Smith and James Overcash appeared for the plaintiff, and Daniel F. Church appeared for the defendant. Documentary evidence and the testimony of Mrs. Shirley Knisley were admitted into the record. The parties filed closing briefs, and the matter is now ready for decision. This order contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(F).

I find in favor of the plaintiff.

The debtor in this case, Big Drive Cattle, L.L.C. ("BDC"), operated a commercial feedlot. Mr. Carol Knisley has held an equity membership in BDC since its inception in February 2009. He purchased cattle at various times that he shipped to BDC for feeding and care until they reached an appropriate size and weight, at which time BDC sold the cattle to third parties on Mr. Knisley's behalf. BDC deposited the proceeds from each sale of Mr. Knisley's cattle with Farm Credit Services of America, where the proceeds were applied against BDC's $1.5 million line of credit account. BDC then, some time later, paid Mr. Knisley an amount equal to the proceeds of each sale less an amount for the feeding and care of the livestock. Several payments to Mr. Knisley under this arrangement occurred in the year before BDC filed for relief under Chapter 11 of the Bankruptcy Code on September 9, 2011, during which time BDC was insolvent. The bankruptcy trustee for BDC filed this adversary proceeding to recover alleged preferential transfers totaling $836,066.64 from Mr. Knisley. The bankruptcy court granted the trustee's motion for summary judgment, but the district court reversed that decision, on the sole issue of whether the proceeds were property of BDC, and remanded the case for further proceedings.

> "Title 11 U.S.C. § 547(b) requires that in order for a transfer to be subject to avoidance as a preference, (1) there must be a transfer of an interest of the debtor in property, (2) on account of an antecedent debt, (3) to or for the benefit of a creditor, (4) made while the debtor was insolvent, (5) within 90 days prior to the commencement of the bankruptcy case, (6) that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation." *Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.)*, 986 F.2d 228, 230 (8th Cir. 1993). The trustee must establish each of these elements by a preponderance of the evidence. *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (8th Cir. B.A.P. 2000).

*Wells Fargo Home Mortgage, Inc. v. Lindquist*, 592 F.3d 838, 842 (8th Cir. 2010). The "look-back" period for transfers is extended to one year in this case because Mr. Knisley is an insider. § 547(b)(4)(B); § 101(31)(B); *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 509-10 (7th Cir. 2011) (holding that under state law, the management of an LLC is vested in its members, so a member is analogous to a corporate director).[1]

In ruling on the summary judgment motion, this court found each element of the preference statute had been established. On appeal, the district court found a genuine issue of material fact as to whether BDC held the funds in bailment for Mr. Knisley and not as an owner, and whether a constructive trust should be imposed on the assets. The district court opinion did not open the door for the parties to relitigate all of the elements of the case. The only issue remanded for fact-finding by this court is whether the proceeds of the sale of the cattle were property of the debtor.[2]

---

[1] There is no evidence in the record concerning BDC's formation or operating agreement.

[2] The defendant, relying on the general language of reversal and remand used by the district court in its order and judgment, maintains that none of this court's findings were affirmed by the district court, thereby rendering the entire scope of the cross-motions for summary judgment ripe for revisiting. I must decline the defendant's invitation to reconsider the evidence on each element of this preference action, because the memorandum opinion accompanying and incorporated by reference into the district court's judgment makes clear that the bailment and constructive trust issues are the only issues to be determined on remand. In fact, the second paragraph of this order contains a statement of facts essentially identical to that used by the district court in its memorandum opinion, including a finding that the debtor was insolvent when these transfers occurred. Moreover, the issues raised by the defendant on appeal were whether this court erred in its findings as to (1) whether the debtor had an interest in the proceeds from the sale of the defendant's cattle; (2) whether a constructive trust or resulting trust should have been imposed upon those proceeds; (3) whether the "swollen assets" doctrine should have been applied to determine that the sale proceeds were not property of the debtor's estate; and (4) whether an alleged bailment agreement between the parties was converted into a debt owed by the debtor to the defendant. These questions all go to the single issue of whether the sale proceeds were property of the debtor, which is the threshold element in

(continued...)

There is no written agreement between the parties governing the terms of Mr. Knisley's arrangement with BCD, but it appears Mr. Knisley periodically purchased calves and shipped them to BDC to be fattened and sold. At no time did he relinquish ownership of the animals to BDC. After feeding and caring for the cattle for several months, BDC then sold the cattle to processors and deposited the proceeds in its account with Farm Credit Services of America ("FCSA"). After subtracting an amount due it for the care and feeding of the animals, BDC issued checks for the balance to Mr. Knisley and his lender, which had a lien on the cattle. The payments at issue in this proceeding are set forth in the chart below, prepared by the defendant based on settlement sheets in evidence.

---

²(...continued)
preference avoidance. Therefore, the bailment and trust issues are the only issues that need to be addressed here. The defendant did not raise on appeal the element of insolvency, which he wishes to argue now. *See, e.g.*, *United States v. Walterman*, 408 F.3d 1084, 1085 (8th Cir. 2005) ("[w]here a remand is limited to the resolution of specific issues, those issues outside the scope of the remand are generally not available for consideration"); *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 203 (3d Cir. 2004) ("We have consistently rejected such attempts to litigate on remand issues that were not raised in a party's prior appeal and that were not explicitly or implicitly remanded for further proceedings."), *quoted in Macheca Transp. Co. v. Philadelphia Indem. Ins. Co.*, 737 F.3d 1188, 1195 n.6 (8th Cir. 2013). As the Third Circuit Court of Appeals so aptly explained,

> When a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel. 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 30.416[2], p. 517 (3d ed. 1984). When the estoppel is operative in proceedings in the same case on remand, courts frequently speak in terms of the law of the mandate or the law of the case rather than collateral estoppel but the underlying principle is the same. *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154 (3d Cir. 1980) (when an appellate court affirms in part and reverses in part, all issues necessarily disposed of in the affirmance become law of the case even though the case is remanded for proceedings on other issues).

*Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3d Cir. 1987). This rule is "necessary to the orderly conduct of litigation" and precludes a party who chose not to argue a particular issue on appeal from benefitting at the expense of a party who appealed that issue and lost. *Id.* at 802 n.2. *Accord Liddell v. Missouri*, 731 F.2d 1294, 1304–05 (8th Cir.), *cert. denied*, 469 U.S. 816 (1984) (holding that the law of the case doctrine prevents the relitigation of settled issues in a case, thus protecting the settled expectations of parties, ensuring uniformity of decisions, and promoting judicial efficiency).

| Lot No. | No. of Head | Weight In | Weight Out | Date Sold | Date BDC Sent Payment to Defendant | Amount Paid to Defendant |
|---|---|---|---|---|---|---|
| 155 | 123 | 581 lbs. | 1188 lbs. | 9/02/2010 | 10/20/2010 | $121,433.63 |
| 181 | 29 | 728 lbs. | 1187 lbs. | 9/02/2010 | 10/20/2010 | $31,735.99 |
| 203 | 149 | 627 lbs. | 1188 lbs. | 9/02/2010 | 10/20/2010 | $136,823.92 |
| 238 | 146 | 664 lbs. | 1194 lbs. | 9/08/2010 | 11/15/2010 | $113,408.74 |
| 170 | 312 | 386 lbs. | 1188 lbs. | 7/07/2010 through 11/12/2010 | 12/02/2010 | $347,084.99 |

The checks issued to Mr. Knisley were written on BDC's operating line of credit with FCSA. BDC obtained an operating loan on March 10, 2010, from FCSA on which FCSA would advance up to $1.5 million on a revolving basis. Mr. and Mrs. Knisley, along with other members of BDC, signed the promissory note on behalf of their revocable living trust, which is how their membership in BDC was held. The note granted FCSA a security interest in any funds held in any deposit accounts and authorized FCSA to exercise the right to apply said funds against any loans or other obligations owed by BDC to FCSA. The Knisleys also personally guaranteed 25 percent of BDC's debt to FCSA. Mrs. Knisley testified that the set-off language in the promissory note did not give FCSA an interest in funds deposited into that account, but no other reasonable interpretation of those terms were provided to the court, and the language of the note is self-explanatory.

Mr. Knisley asserts here that BDC held the sale proceeds as a bailment or otherwise in trust for him, such that they did not become the property of BDC.

Bailment is defined as

> the delivery of personal property for some particular purpose or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it or otherwise dealt with according to that person's directions or kept until reclaimed, as the case may be.

*Gerdes v. Klindt*, 253 Neb. 260, 268, 570 N.W.2d 336, 342 (1997). Nebraska case law also states that bailment involves the "delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *Id.* at 268, 570 N.W.2d at 342–43.

*Peterson v. Homesite Indem. Co.*, 840 N.W.2d 885, 893 (Neb. 2013).

Well-established Eighth Circuit law holds that the security interest of a bailee's creditor does not attach to goods that are the subject of a true bailment. *Rohweder v. Aberdeen Prod. Credit Ass'n*, 765 F.2d 109, 112 (8th Cir. 1985). However, if the debtor/bailee has "sufficient rights" in the bailed property, then a creditor's security interest may attach. *Id.* The "crucial question" in determining whether the bailee possessed sufficient rights is the parties' intent. *Id.* at 113. In *Rohweder*, the issue was whether the plaintiff intended to create a bailment, in which case the bailee would not have had sufficient rights for the lien to attach, or whether the plaintiff intended to make a conditional sale to the bailee, in which case the bailee would have held sufficient rights in the property for the security interest to attach. The case was remanded for fact-finding and it eventually settled. Subsequent cases in the lower courts have used *Rohweder* as a starting point in trying to determine what constitutes sufficient rights in property to allow it to be pledged as collateral. Not long after the *Rohweder* decision, the North Dakota bankruptcy court turned to Seventh Circuit caselaw to supplement "the absence of clear guidelines from the Eighth Circuit" in *Rohweder*. *Union State Bank of Hazen v. Cook (In re Cook)*, 63 B.R. 789, 798 (Bankr. D.N.D. 1986). In *In re Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir. 1980), the appellate court pointed out that the entire discussion about rights in the collateral flows from "the general principle that 'one cannot encumber another man's property in the absence of consent, estoppel or some other special rule.'" 618 F.2d at 436. Therefore, "a debtor possess sufficient rights in collateral if the true owner agrees to the debtor's use of the property as security or if the true owner is estopped to deny creation of the security interest." *Cook*, 63 F.2d at 798 (citing *Northwestern Bank v. First Va. Bank of Damascus*, 585 F. Supp. 425, 429 (W.D. Va. 1984)); *Pubs, Inc.*, 618 F.2d at 436.

Here, the owner's consent is what removes the sale proceeds from the bailment context. The Knisleys, in their membership capacity, signed the promissory note and agreed to the use of BDC's deposit accounts as security for the loan. The funds deposited into the account were considered payment against advances on the revolving line of credit. When the proceeds from the sale of the Knisley cattle were deposited into that account, the funds lost the protection they would otherwise have had as bailment proceeds because as members of BDC, the Knisleys took on this risk, in contrast to a traditional bailor. The Knisleys, as members, gave FCSA a security interest in collateral that included the proceeds of the sale of their cattle, so the debtor did have sufficient rights in the property at issue to pledge it. Thus, the purported bailment did not cause these funds to be separate from the debtor's other property. The sale proceeds became the debtor's property, even though BDC did not own the cattle, by virtue of the Knisleys' consent.

Mrs. Knisley testified that she and her husband have placed cattle at other feedlots to be fed out and the practice has always been for the Knisleys to ship the cattle to the feedlot where the animals are fed, cared for, and sold to a packing house. Payment for feed and other expenses are deducted from the sale proceeds, and the feedlot then forwards the balance to the Knisleys. She believed the same procedure was followed at BCD. However, the record does not indicate whether the Knisleys have an ownership interest in any of the other feedyards they do business with, or whether it is simply an arms'-length transaction in which they place their cattle in the care of others and pay for the convenience of doing so out of the proceeds when the animals are sold. This is a key

distinction, as Mr. Knisley's membership interest in BDC caused him to be a co-maker of the FCSA promissory note and, to a certain extent, liable for BDC's debt.

This court was also instructed to consider on remand whether a constructive trust or the swollen assets doctrine was applicable in this matter.

> [A] constructive trust [i]s a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment. Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

*United Gen. Title Ins. Co. v. Malone*, 858 N.W.2d 196, 213-14 (Neb. 2015) (footnotes omitted).

The imposition of a constructive trust requires a showing by clear and convincing evidence that the debtor obtained the property by fraud, misrepresentation, or the abuse of an influential or confidential relationship, and the debtor's retention of the property would constitute an unjust enrichment. In light of the findings above, no such evidence exists in this record.

The district court also wanted this court to address the "swollen assets" doctrine, which is an equitable tool that

> allows a beneficiary to trace into the estate of an insolvent trustee on the theory that the use of trust funds to pay the personal debts of the trustee relieved him from using his individual property for that purpose and consequently increased the amount of it on hand at insolvency. Thus, it could be said that using trust funds to pay personal debts had increased the assets on hand at the time of determining the rights of creditors and other claimants to the trustee's estate.

*In re Estate of Chaney*, 439 N.W.2d 764, 775 (Neb. 1989). It is used to remedy a trustee's conversion of trust property. For the reasons explained above in the bailment discussion, no conversion occurred in this case, so the swollen assets doctrine is inapplicable.

Given that the evidence now establishes the funds transferred were property of the debtor (that is, the funds used to pay defendant were draws on BDC's line of credit at FCSA), and the remaining elements of a preferential transfer were previously established, Mr. Knisley urges the court to consider the "ordinary course of business" defense found in § 547(c)(2). Section 547(c)(2) provides that the trustee may not avoid a transfer to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and

the transferee and such transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee. The transferee bears the burden of establishing the ordinary course of business defense by a preponderance of the evidence. *Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys., Inc.)*, 460 F.3d 1041, 1044 (8th Cir. 2006). The Eighth Circuit Court of Appeals recently reiterated that "the court must engage in a peculiarly factual analysis" to determine whether a preferential transfer was made within the ordinary course of business between the parties because there is no precise legal test to apply. *Cox v. Momar Inc. (In re Affiliated Foods Sw. Inc.)*, 750 F.3d 714, 719 (8th Cir. 2014).

> "[T]he cornerstone" of the inquiry is that the creditor must demonstrate "some consistency with other business transactions between the debtor and the creditor." [*Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991)] . . . "[T]he analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day [preference] period reflected 'some consistency' with that practice." 931 F.2d at 498. This inquiry is not resolved simply by looking at the terms of any contract between the parties. "[A] 'late' payment really isn't late if the parties have established a practice that deviates from the strict terms of their written contract." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993); *accord Lovett*, 931 F.2d at 498–99.

*Id.* at 719-20.

The *Affiliated Foods* decision also establishes that the "look-back" period for ascertaining the ordinary course of business between the parties depends on the facts of each case. The standard used in one case may not be appropriate in another case because the "purpose of a look-back period is to evaluate whether challenged transfers 'conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.'" 750 F.3d at 720 (quoting *Tolona*, 3 F.3d at 1032). In *Lovett*, 720 invoices had been paid in the year preceding the preference period and 122 invoices were paid during the preference period, providing a sufficient sample for the court to establish the parties' ordinary course of business. In contrast, the parties in *Affiliated Foods* had only nine transactions in the two years prior to the petition date, with just three transactions outside of the preference period. The court determined that the two-year look-back period established a "far better benchmark." *Id.*

In this case, there is no evidence of the parties' course of business prior to the payments at issue. There also is no evidence of ordinary business terms in the cattle-feeding industry. Mrs. Knisley testified that it took longer than she thought it should have for BDC to issue payments after the cattle were sold, but she did not receive an explanation for the delay. For the three lots of Mr. Knisley's cattle sold on September 2, 2010, BDC did not send checks until October 20, nearly seven weeks later. For the lot of cattle sold the following week, on September 8, 2010, Mr. Knisley was not paid until November 15, 2010, nearly 10 weeks later. For the lot of cattle apparently sold piecemeal between July and November 2010, the check was issued just 30 days after the final sale, but was not honored when initially presented for payment. It is unclear whether BDC typically took several weeks

to pay the owners of the cattle, but Mrs. Knisley's testimony suggests the lengthy process was unexpected. I cannot find on this record that the defendant has established a consistent payment practice between the parties that would indicate these payments were made in the ordinary course of business.

In summary, the evidence before the court does not establish that the proceeds from the sale of Mr. Knisley's cattle were excluded from BDC's property. The loan documents gave FCSA a security interest in BDC's deposit accounts, so when BDC deposited the sale proceeds into the FCSA account, the funds served as payment on the operating line of credit advanced to BDC. Mr. Knisley's knowledge of and consent to this arrangment removed any bailment protection he may otherwise have had. There is no evidence of fraud, misrepresentation, conversion, or the abuse of an influential or confidential relationship, so the use of a constructive trust or the swollen assets doctrine to protect Mr. Knisley's property rights is unavailing. Finally, Mr. Knisley was unable to establish that the transactions between him and BDC were conducted in the ordinary course of their business, so that defense does not preclude the trustee from recovering for the estate the proceeds at issue here as preferential transfers.

IT IS ORDERED: The funds at issue here were property of the debtor and their transfers to the defendant were preferential. Separate judgment will be entered.

DATED: March 30, 2015.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *James A. Overcash
    Daniel F. Church
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.